Robert W. Sadowski
Raphael Katz
**SADOWSKI KATZ LLP**
**830 Third Ave, Fifth Floor**
**New York, New York 10022**
**Tel. No.: (646) 503-5341**

*Attorneys for Dr. Alfred Robenzadeh*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DR. ALFRED ROBENZADEH,** | |
| **Plaintiff,** | |
| **- against -** | **Civ. No.:** |
| **WESTCHESTER COUNTY HEALTH CARE CORPORATION, d/b/a WESTCHESTER MEDICAL CENTER, ABRAHAM BARTELL, STEPHAN FERRANDO, FREDRICK Z. BIERMAN, ALAN R. LIEBOWITZ, PAMELA SILLER, and CAROL DeFILIPPIS,** | **COMPLAINT** |
| **Defendants.** | |

Dr. Alfred Robenzadeh ("Dr. Robenzadeh") by and through his attorneys, Sadowski Katz LLP, alleges for his complaint as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.     This is a civil action brought by Dr. Robenzadeh against the Defendants Westchester County Health Care Corporation, d/b/a Westchester Medical Center ("WMC"), Dr. Abraham Bartell ("Dr. Bartell") Dr. Stephan Ferrando ("Dr. Ferrando"), Dr. Fredrick Z. Bierman ("Dr. Bierman"), Alan R. Liebowitz ("Liebowitz"), Dr. Pamela Siller ("Siller"), and Carol DeFilippis ("DeFilippis") (collectively "Defendants") under the retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3729(h), and the New York State False Claims Act N.Y. Fin. L.§ 191, N.Y. Labor Law § 741, as well as under state law claims to recover damages

sustained by Dr. Robenzadeh.[1]  Defendants retaliated against Dr. Robenzadeh for his bringing to light and attempting to correct Defendants' violations of the Federal and State False Claims Acts, which resulted in patient harm and abuse and defrauded the Medicaid Program.

2.      Beginning in May 2015, Dr. Robenzadeh began bringing to light to Defendants violations of its academic medical center training program ("Training Program"), patient abuse, and Medicaid billing fraud.  In response, Defendant Dr. Ferrando, the Director of the Behavioral Health Department, orchestrated, with the aid and abetting of Defendants Drs. Siller, Bartell, Bierman and Mr. Liebowitz, a coordinated campaign of intimidation, coercion and retaliation intended to silence Dr. Robenzadeh.

3.      Defendants knowingly engaged in the policy and practice of provoking child and adolescent psychiatric inpatients to execute disruptive behaviors so that nursing staff could request orders from physicians for the use of physical or chemical restraints that would increase the severity of the diagnosis and prolong unreasonably and unnecessarily the patient's inpatient stay, for which WMC was wrongfully reimbursed by Medicaid.  In connection with the treatment and claims for reimbursement for child and adolescent psychiatric inpatients, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval; knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and conspired to commit the above acts, all in violation of 31 U.S.C. §§ 3729(a)(l)(A), (B), & (C) and N.Y. Fin. L. § 189 *et seq.*

---

[1] Plaintiff has served a Notice of Claim pursuant to N.Y. Municipal Law § 50(e) on WMC and when that claim process is exhausted, Plaintiff intends to seek leave to amend the complaint to include his State law claims for Defendants' defamation, tortious interference with contract/prospective business relations, and breach of contract.

4.      Dr. Robenzadeh provided written notification to WMC that Defendants' actions, of which he complained, constituted fraud and a violation of the Federal and States False Claims Act.

5.      This action also seeks to recover damages suffered by Dr. Robenzadeh caused by Defendants' unlawful retaliation in violation of 31 U.S.C. § 3730(h) and N.Y. Fin. Law 191, and N.Y. Labor Law § 741, and injunctive relief to cause Defendants to issue accurate certification of Dr. Robenzadeh's academic and clinical graduate medical training, which Defendants have refused to do, thus continuing to harm Plaintiff's career.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), and supplemental jurisdiction over the remaining claims.

7.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the Southern District of New York and Defendants reside in New York, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

8.      Plaintiff is Dr. Robenzadeh, who at the time of his termination from WMC, had concluded his fourth of his five-year training in adult, and child and adolescent psychiatry leading to his board certification in those two specialties.  Had Dr. Robenzadeh been allow to complete his fellowship, he would have been eligible to take his adult, and child and adolescent psychiatry boards in September 2017 and 2018, respectively.

9.      Dr. Abraham Bartell is the Director of Child and Adolescent Psychiatry Service at WMC.

10.     Dr. Stephen Ferrando is the Director of the Behavioral Health Center ("BHC") at WMC.

11.     Dr. Fredrick Z. Bierman, and Dr. Carol DeFilippis are Director and Associate Director of Graduate Medical Education ("GME") at WMC

12.     Alan R. Liebowitz is Director of Labor Relations at WMC.

13.     Defendant WMC is a regional tertiary hospital serving Westchester County.  It is located in Valhalla, New York.  WMC is also an academic medical facility.

## THE LAW

**A.     The Federal False Claims Act Relief from Retaliatory Actions.**

14.     Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

15.     Relief shall include reinstatement with the same seniority status that employee, contractor, or agency would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

31 U.S.C. § 3730(h).

**B. The New York State False Claims Act Protection from Retaliation**

16.     Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or

penalized by an employer, or a prospective employer, because of lawful acts done by the

employee, contractor, agent or associated others in furtherance of an action brought under this

article or other efforts to stop one or more violations of this article, shall be entitled to all relief

necessary to make the employee, contractor or agent whole.  Such relief shall include but not be

limited to:

(a) An injunction to restrain continued discrimination;
(b) Hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position;
(c) Reinstatement of full fringe benefits and seniority rights;
(d) Payment of two times back pay, plus interest; and
(e) Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## C.  New York Labor Law § 741

17.     New York Labor Law provides that "no employer ['who provides health care

services in a facility'] shall take retaliatory action against any employee who does any of the

following:"

(a) Discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or
(b) Objects to or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

## FACTS

**Abuse of Medicaid Eligible Child and Adolescent Psychiatric Inpatients**

18.     Dr. Robenzadeh raised many concerns at WMC, at least two of which rise to the

level of violations of the Federal and New York State False Claims Acts.

19.     Specifically, Dr. Robenzadeh alerted the institution to the excessive, unnecessary

and unreasonable use of excess force, *i.e.,* physical and chemical restraints, in connection with

the treatment of child and adolescent psychiatric inpatients.

20.     The excessive use of force resulted in extended, unreasonable and unnecessary in-patient treatment days, for which the hospital is reimbursed by Medicaid.

21.     Additionally, Dr. Robenzadeh complained of Defendants' use of medical trainees, both residents and fellows, to perform routine clerical tasks that serve no clinical or training function according to the Accreditation Council of Graduate Medical Education ("ACGME") VI. A. & B.

22.     Ordinarily, health care insurance provides up to 14 days of inpatient care reimbursement for psychiatric disorders.

23.     With Medicaid eligible psychiatric inpatients, by policy and practice, the WMC billing department alerted nursing staff at the BHC, when reimbursement was scheduled to cease for each inpatient.

24.     Rather than discharge child and adolescent psychiatric inpatients, nursing staff provoked, taunted, incited, or engaged in other behaviors that caused child and adolescent inpatients to engage in disruptive behaviors, and rather than using de-escalation techniques that would not require the administration of chemical or physical restraints, the nursing staff's first and preferred response to the provoked behavior was to seek an order from a physician for the administration of a chemical or physical restraint to sedate the patient.  Having provoked a disruptive behavior and administered a chemical or physical restraint, WMC fraudulently justified an increase in the severity of the diagnosis and wrongfully continued the inpatient stay and continued wrongfully to collect Medicaid reimbursement unreasonably and unnecessarily.

25.     Aside from the increased Medicaid reimbursement inducement, by holding Medicaid patients longer, there are fewer discharges and admissions of inpatients, which

processing involves heavy work load, whereas managing existing inpatients maintains a lighter work load for the nursing staff.

26.      On occasion, while on duty in the BHC, nursing staff called Dr. Robenzadeh asking for restraints to be ordered for a patient who was acting out in a disruptive manner. Rather than issuing the order without observing the patient, he went to the patient and witnessed staff encroaching on the inpatient's space and using provocative and threatening language and tone, which caused an escalation of the patient's agitation.  In lieu of ordering a restraint, Dr. Robenzadeh engaged the patient with de-escalation techniques, which cause the patient's aggravation and aggression to subside, rendering no need for the administration of a restraint.  In response to one encounter and its calming result on the patient, the nursing staff responded by saying "Great, now we can't even touch him."  Dr. Robenzadeh took this to mean that the policy and plan of the staff was to use a chemical or physical restraint, and he foiled their intention to use a restrain, thus resulting in their disappointment.

27.      In May 2015, Dr. Robenzadeh sent an e-mail to Drs. Siller and Yoon addressing a specific incident of patient abuse of Patient X on the B1 unit of BHC.  Dr. Robenzadeh believed the incident with Patient X demonstrated and was an example of abuse that could serve as an opportunity to address the culture of abuse.  In one response to this disclosure, in July 2015, at Dr. Robenzadeh's annual evaluation, Dr. Siller met with Dr. Robenzadeh and told him to "keep your head down and not make any more waves."

28.      When Dr. Robenzadeh brought this observation to his supervising physicians and the director of BHC, he asked whether he could conduct a study of the inpatient metrics to determine whether what he observed was an actual policy and practice.  As a result of this request and his desire to shed light and bring the practice to an end, he was marginalized, warned

7

to cease, and suffered retaliatory treatment, and ultimately confronted with trumped-up charges, a suspension, and terminated from his fellowship.

**Violations of ACGME Standards for Training**

29.     Dr. Robenzadeh complained that limiting moonlighting approval of trainees as punishment for reporting misconduct was itself another training violation and specifically forbidden in the employment contract.

30.     By his actions both in writing and orally, Dr. Robenzadeh alerted Defendants that WMC is (1) Not meeting or complying with the Fellowship/Residency training requirements outlined by ACGME, and (2) engaging in fraudulent behavior that would be the basis of a False Claims Act action for violating terms of payment from the government and falsely certifying compliance when in fact the institution is failing to comply with material terms of its conditions to receive enhanced Graduate Medical Education reimbursement from the government.

31.     As WMC knows and has been informed, the loss of the institution's teaching accreditation, would result in the significant loss of reimbursement from Federal Medicare, State Medicaid as well as other government-funded programs.

32.     Dr. Robenzadeh's complaints of the use of excessive force by physical and chemical restraints and causing residents and fellows to perform routine clerical work are violations of Westchester's terms of its accreditation as a teaching facility.  Indeed, WMC's accreditation may already be the question of an audit, and these charges during an audit should be taken seriously.  The silencing of a whistleblower through retaliation for raising issues that constitute fraud against government-funded programs, violates the federal False Claims Act, the New York State False Claims Act as well as New York Labor Law section 741, which provides protection for health care workers, who raise concerns of fraud or abuse.

**Retaliatory Actions**

33.     After Dr. Robenzadeh's expressed his concerns, WMC, aided and abetted by the individual Defendants commenced an organized and coordinated, and ever escalating campaign of retaliatory actions.

34.     Immediately after he raised these concerns he was subjected to disparate treatment, marginalized, stymied in his attempts to moonlight, made a scape goat, harassed and ultimately subjected to suspension and termination from the WMC fellowship program.

35.     Since alerting the institution to these issues he became the victim of a campaign of intimidation, coercion, and retaliatory action that directly affects his training, promotion and career and professional prospects.

36.     In December of 2014, Dr. Robenzadeh brought to Dr. Steinberg's attention concerns that the training program had unequal work load distribution and selective policies based on gender, race and ethnicity, which Dr. Robenzadeh documented in his evaluation.  Dr. Steinberg in response deferred to Dr. Siller, who would be assuming the position of Program Director in the next few months.  Dr. Siller's racist and misandrist bias, however, was in large part the source of Dr. Robenzadeh's complaint.

37.     Around the same time that Dr. Robenzadeh expressed his concern to Dr. Steinberg, he also addressed his concern to Dr. Siller, because she was the Attending physician on B1, the child and adolescent unit of BHC.

38.     Dr. Robenzadeh's concerns were: (1) He was assigned on average 8 patients while two other female fellows were assigned on average only 5 patients; (2) Fellows other than Dr. Robenzadeh were able to pick their patient assignments to obtain better training experience and exposure; (3) Fellows other than Dr. Robenzadeh were given the option to change rotation

assignments and schedules for better training experience or personal convenience; (4) Dr. Robenzadeh was required to conduct group therapy sessions 4 times per week, when other Fellows were excused from that required activity.

39.     At first, Dr. Robenzadeh was ignored, however, once he began to document his concerns in his evaluations, Dr. Siller and the other Defendants began to push back:

a.   Dr. Robenzadeh's had difficulty obtaining vacation approval;

b.   Dr. Robenzadeh was asked to relinquish vacation days to suit the convenience of other fellows; and

c.   Despite 6 months of advance notice of his request for a schedule, his request received no consideration.

40.     During March 2015 to June 2015, Dr. Robenzadeh frequently raised to Dr. Siller and Dr. Yoon his continuing concern about the mistreatment of patients in the child and adolescent unit; including concern that male patients without parents in "residential placement," received totally different treatment.  Male patients were treated as second class and as troublemakers, who were assumed to be aggressive, and much more likely to be physically injured by staff.  If the patient's complexion was any shade of brown, their concerns, *e.g.,* pain, stress or hunger, were neglected because the culture of the unit devalued them as patients.  If the patient came from a residential placement and not a home with parents, there was no one paying attention to what WMC did to them or treated them, and the staff were aware of that fact and neglected or abused them freely.

41.     The escalation of retaliation against Dr. Robenzadeh made clear that there was a retaliatory consequence to speaking out about patient mistreatment, training program deficiencies and complaining about his own retaliatory treatment.

42.     In late July of 2015, at Dr. Siller's annual evaluation of Dr. Robenzadeh, she expressly warned him to "keep your head down and do not make any more waves."

43.     Around the same time as his July evaluation, Dr. Robenzadeh moved to a full-time position at the outpatient clinic.  True to their threats, the front staff at the outpatient clinic were directed to do to Dr. Robenzadeh exactly what Dr. Siller had warned: "make life miserable."

44.     The front staff at the outpatient clinic scheduled Dr. Robenzadeh's new patient intake, which can take 2 hours for Friday at 5:00 pm.  The staff assigned a disproportionately large number of new patients to Dr. Robenzadeh.  The staff changed patient schedules without informing Dr. Robenzadeh.  The staff told patients that they could come by and pick up prescriptions for controlled substances without being seen by Dr. Robenzadeh—something Dr. Robenzadeh explicitly told the staff that he would not do.

45.     Two female fellows went days without seeing any outpatients because they were moonlighting at positions Defendants had set up for them—leaving little time to see WMC out patients.  One female fellow saw no patients on Fridays due to moonlighting that exceeded the limits on moonlighting hours set by ACGME.

46.     Astonishingly, when patients complained that the two female fellows were cancelling appointments and not seeing them, the clinic clerks, under instructions from the training program, blamed Dr. Robenzadeh and complained to internal oversight Cathy Chivarello.

47.     On July 10, 2015, Dr. Robenzadeh sent an e-mail entitled "Training Concerns" to Dr. Bierman, the director of Graduate Medical Education, requesting an opportunity to discuss Dr. Robenzadeh's concerns.

48.     On July 15, 2015, Dr. Robenzadeh sent an e-mail entitled "punitive retaliatory and unprofessional behavior" to Dr. Siller, Dr. Yoon, who became Dr. Robenzadeh's direct supervisor, and Dr. Ferrando, the Director of Psychiatry at WMC, and the Chairman of Psychiatry at New York Medical College.

49.     On August 10, 2015, Dr. Robenzadeh brought his concerns to the attention of WMC administrative leadership, including Eric Amoh, Marsha Casey, Gary Brudinski and the Direct of WMC Michael Israel.

50.     Dr. Ferrando avoided and refused to speak to Dr. Robenzadeh about his patient abuse concerns.

51.     Dr. Ferrando excluded Dr. Robenzadeh from all but one of the eight mandated ACGME Quality Improvement Committee meetings.  In the one quality improvement meeting Dr. Robenzadeh was allowed to attend, in January 2016, Dr. Ferrando left the meeting just prior to Dr. Robenzadeh's opportunity to speak.  At this meeting, Dr. Robenzadeh orally submitted a written proposal offering to analyze the Metrics from the B1 unit to determine why stable patients were reported as having high acuity events just before being scheduled for discharge.  In February and March 2016, Dr. Robenzadeh's written correspondence and proposal to do the Metrics study was blocked by Dr. Bartell   Dr. Bartell told Dr. Robenzadeh that trying to participate in a Quality Improvement Study would be considered a violation of the clinical restrictions imposed on Dr. Robenzadeh in connection with the trumped-up disciplinary proceedings ongoing against him.

52.     His involvement in mandated Quality Improvement Committee initiatives, important aspects of his medical training, were obstructed in an effort to conceal the patient abuse he had made clear he intended to openly address.

53.     Dr. Robenzadeh was also excluded from ACGME Training Survey.  When excluded from the quality improvement study, Dr. Robenzadeh contacted ACGME to complain; he was then allowed to participate the survey.

54.     Every resident and fellow, except Dr. Robenzadeh was required to complete a quality survey.  Dr. Bartell told Dr. Robenzadeh that his survey was optional.  In the hallway after a meeting, Dr. Bartell pointedly turned to Dr. Robenzadeh and threaten him to "be careful what you say" and "remember what is important here."

55.     Dr. Robenzadeh's requests for time off have been denied or revoked.

56.     He has been forced to use vacation days for interviews despite the availability of having 5 days dedicated for interviews.

57.     He was required to write a proposal for an elective, that he was already approved for—a requirement he was informed of on New Year's Eve, and not required by other fellows.

58.     The institution blocked his moonlighting opportunities without justification, thus diminishing Dr. Robenzadeh's professional standing and reputation as well as depriving him of economic opportunities.

59.     Dr. Robenzadeh applied to and received at least 4 written or oral offers for moonlighting employment at Jamaica Hospital, Sagamore Hospital, Northwell Health System and Access Supports for Living.  WMC sabotaged each of these opportunities by failing or refusing—as they continue to do today—to document Dr. Robenzadeh's training program, that WMC is contractually obligated to provide under its training contract.

60.     All this retaliation was done in the face of Dr. Robenzadeh's excellent standing in the program as documented in his evaluations, excellent letters of recommendation, and a history of providing excellent care far and above that of his peers in the fellowship program.

61.     On occasion, Dr. Siller told Dr. Robenzadeh that the hold up on documentation needed for moonlighting opportunities was "financial" and that the GME office ow WMC needed to "get paid" before they would approve a moonlighting opportunity.  This was taken to mean that WMC would get a "payment" or benefit of some type from the moonlighting employer, whether money or referrals.

62.     Once it became clear to Dr. Robenzadeh that Defendants intended to block career opportunities as punishment for speaking out, he began contacting ACGME and the Psychiatry and Neurology Boarding body ("ABPN").  Specifically, Dr. Robenzadeh complained that Defendants failure to enter his training verification information into the central database.  The failure to document his training would block Dr. Robenzadeh's board eligibility for at least one year.  Blocking training documentation and career opportunities allowed WMC to keep Dr. Robenzadeh in servitude for an extended period.

63.     Once correspondence with ABPN clarified Defendants' obligations to document training, Defendants shifted their attack on Dr. Robenzadeh.

64.     Dr. Ferrando hired Dr. Bartell with a mandate to find a pretext for Dr. Robenzadeh's suspension/termination.  Alan Leibowitz, the Director of Labor Relations delayed the disciplinary process causing the suspension from WMC to drag on and thus prolonged an interruption in training.  Every attempt to resolve the proposed discipline was conditioned on Dr. Robenzadeh signing a release that bound him to silence about the training program violations, the patient abuse, and billing fraud.

65.     Potential employers, colleagues, and licensing bodies have been contacted and fed derogatory information and accusations about Dr. Robenzadeh without merit or substantiation.

66.     Defendants have spread vicious rumors about Dr. Robenzadeh—that he made unauthorized contact with prior patients in order to damage his reputation.  Two colleagues have referenced this rumor in conversations.  As there was limited access to the confidential disciplinary proceedings the rumors could only have been disseminated by Defendants Bartell and Liebowitz.

67.     Defendants are prohibiting Dr. Yoon from providing letters of recommendation; in past requests, a reference letter was produced in 3 days, a current request has been pending for 3 months.

68.     Finally, the institution has belatedly fabricated charges, which even if they were true—and they are not—are an insufficient justification for dismissal from the fellowship program.

69.     WMC alleged that, on October 21, 2015, without prior authorization, Dr. Robenzadeh cancelled patient visits in the Hospital clinics and, instead, engaged in moonlighting during scheduled resident work hours.  WMC also alleged that on October 28, 2015, without prior authorization, Dr. Robenzadeh cancelled patient visits in the Hospital clinics and, instead, engaged in moonlighting during scheduled resident work hours.

70.     The fabricated claim that patients' visits were cancelled so Dr. Robenzadeh could moonlight is not only false, but quite the opposite occurred.  Dr. Robenzadeh's approved moonlighting schedule was set for the off hours from 5:00 to 8:00 p.m.  At the request of his patients, who asked to be seen late in the day, Dr. Robenzadeh rearranged his schedule to accommodate these patients and saw patients at the BHC in his off hours of October 21 and 28, 2015.  Accordingly, Dr. Robenzadeh, as is his practice, placed his patients' needs first.  A simple investigation of these incidents would have spared Dr. Robenzadeh these baseless allegations.

The fact that WMC failed to do so and later despite evidence to the contrary found the charge substantiated clearly is the result of animus based on his disclosures of illegal improprieties of WMC as discussed above.

71.     WMC lodged another false allegation at Dr. Robenzadeh stating, in or about July 2015, without prior approval from the Program Director, Dr. Robenzadeh established a private practice that advertised services as a clinician offering child and adolescent psychiatric and substance abuse treatment.

72.     To the contrary, Dr. Robenzadeh did not establish a private practice; this allegation is false.  Dr. Robenzadeh set up a website to determine the web traffic it would generate.  However, no patients were seen; no physical office existed; and no patient inquiries about treatment were made.  In fact, the contact field on the website was not set up.

73.     WMC lodged yet another allegation against Dr. Robenzadeh—that he acted in breach of professional responsibilities when he advertised himself as fully-qualified to provide unsupervised Suboxone treatment in a solo practice, allegedly without having completed training in child or general psychiatry or allegedly having completed required substance abuse addiction training.  WMC also alleged that Dr. Robenzadeh established an unauthorized outside private practice that did not include a required affiliation with an appropriate comprehensive community-based substance abuse service.

74.     The assertion that Dr. Robenzadeh advertised beyond his qualifications is false. First, true to his character, he took great care to represent himself accurately.  Nowhere on the web site was he listed as board certified or eligible; instead he is referred to as a "Child and Adolescent Fellow," which accurately depicts his training and status.  Second, Dr. Robenzadeh is in fact a New York State licensed medical doctor with independent malpractice insurance.  In

addition, Dr. Robenzadeh does have training to treat and a license to prescribe Suboxone for up to 30 opioid-dependent patients through the Substance Abuse and Mental Health Services Administration.

75.     Had an adequate investigation been conducted, or had someone spoken with Dr. Robenzadeh about these matters, they could have been easily resolved.  Instead, WMC's charges here are yet another example of retaliation and intimidation designed to thwart and discredit Dr. Robenzadeh's reporting departmental violations and health care fraud.

76.     After a meeting to resolve these baseless accusations, WMC retaliated by then charging Dr. Robenzadeh with violating HIPPA medical privacy by using patients records to defend the accusations about the patients he was treating.  There were no HIPPA violations because this was an internal meeting and all individuals present had authority to see all the records presented.

77.     In a yet further blow, whereby WMC intends to discredit him professionally, permanently harm him, and manufacture additional coercive leverage, WMC is withholding without justification and against the rules, requirements and obligations applicable to academic institutions, any verification of Dr. Robenzadeh's training at WMC.  To date, this has cost both one year of delayed training and one year of extra training.

78.     WMC, still not content in its efforts to intimidate Dr. Robenzadeh and any other physician who might consider blowing the whistle on WMC's illegal practices, WMC maliciously published the accusation that he reached out to a patient, which accusation is potentially devastating to a child and adolescent psychiatrist.

**FIRST CLAIM**
**Violations of the Federal False Claims Act**
**(31 U.S.C. § 3730(h))**
**Retaliation**

79.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

80.     Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

81.     Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him, by defaming him, by harming his educational and professional development, and by denying him moonlighting opportunities.

82.     Such conduct by Defendants was due to actions Plaintiff has taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

83.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**SECOND CLAIM**
**Violations of the State False Claims Act**
**(N.Y. Fin. Law § 191)**

84.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

85.     Defendants violated Section 191 of the New York False Claims Act § 191.

86.     Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him, by defaming him, by harming his past present and future business and professional and academic development.

18

87.     Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

88.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**THIRD CLAIM**

**New York Labor Law § 741**

89.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

90.     Defendants violated Section 191 of the New York False Claims Act § 191.

91.     Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him, by defaming him, by harming his past present and future business and professional and academic development.

92.     Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

93.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**FOURTH CLAIM**

**Injunctive Relief**

94.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

95.     Dr. Robenzadeh completed four years of his fellowship.  WMC has refused to provide Dr. Robenzadeh with verification, certification and all other necessary documentation to show to prospective employers that he has completed his academic and clinical work.

96.     Withholding any credentialing material is being done maliciously with the direct intent and result of making it difficult for Dr. Robenzadeh to advance his education, to advance his professional development and to maximize through his life his professional standing and earning potential.

97.     Defendants intended and did inflict harm to Plaintiff, which resulted in special damages, including but not limited to the loss of employment, business contracts and business opportunities.

98.     Such conduct by Defendants has damaged Relator in a substantial amount, to be determined at trial.

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as

follows:

(a)   On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor § 741, for double his back salary in an amount to be determined at trial, and restitution and payment of all benefits with interest.

(b)   On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor Law § 741, an award of costs and attorney's fees; and

(c)   On Fourth Claim awarding the Plaintiff injunctive relief, including the production of verification of his academic and clinical training. including litigation costs, and reasonable attorney's fees; and

(d)   Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York,
        September 25, 2016

**SADOWSKI KATZ LLP**

By:

Robert W. Sadowski
Raphael Katz
830 Third Avenue, Fifth Floor
New York, New York 10022
Telephone: (646) 503-5341
rkatz@sadowskikatz.com
rsadowski@sadowskikatz.com